UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**HEALTH FIRST, INC., HOLMES
REGIONAL MEDICAL CENTER, INC.,
CAPE CANAVERAL HOSPITAL, INC.,
HEALTH FIRST PHYSICIANS, INC.,
HEALTH FIRST HEALTH PLANS,
INC. and HEALTH FIRST
INSURANCE, INC.,**

               **Plaintiffs,**

**v.**                                        **Case No:  6:15-cv-718-Orl-41DCI**

**CAPITOL SPECIALTY INSURANCE
CORPORATION, DARWIN
NATIONAL ASSURANCE COMPANY,
DARWIN SELECT INSURANCE
COMPANY, EXECUTIVE RISK
INDEMNITY, INC. and EXECUTIVE
RISK SPECIALTY INSURANCE CO.,**

               **Defendants.**

_____/

## ORDER

THIS CAUSE is before the Court on the Motion for Summary Judgment (Doc. 41) filed

by Defendants Executive Risk Indemnity, Inc. and Executive Risk Specialty Insurance Co.

(collectively, "Executive Risk"), to which Plaintiffs filed a Response (Doc. 49). Executive Risk

filed a Reply (Doc. 51) as well as two Notices of Supplemental Authority (Doc. Nos. 70, 97). This

cause is also before the Court on the Motion for Summary Judgment (Doc. 45) filed by Defendants

Capitol Insurance Corporation, Darwin National Assurance Company, and Darwin Select

Insurance Company (collectively, "Allied World"). Plaintiffs filed a Response (Doc. 50), and

Allied World filed a Reply (Doc. 53) as well as two Notices of Supplemental Authority (Doc. Nos.

69, 96). Additionally, before the Court is Plaintiffs' Motion to Strike (Doc. 54) and Executive

Risk's Response (Doc. 57). For the reasons stated herein, Plaintiffs' Motion to Strike will be denied and Defendants' Motions for Summary Judgment will be granted.

## I.  FACTUAL BACKGROUND

Plaintiff Health First, Inc. ("Health First") was first formed in 1995 when two Brevard County hospitals, Plaintiff Holmes Regional Medical Center and Plaintiff Cape Canaveral Hospital, merged to form a non-profit organization to provide integrated healthcare services. (Doc. 49 at 9).[1] In 2011, Health First opened another hospital in Viera, Florida. (*Id.*). Health First also operates a physician group, "Health First Physicians, Inc.," and has its own network of managed care health plans offered through Plaintiff Health First Health Plans, Inc. ("HFHP") and Plaintiff Health First Insurance, Inc. (Mathias Aff. in Resp. to Executive Risk's Mot. for Summ. J., Doc. 49-17, ¶¶ 4–9). Plaintiffs were named as defendants in several lawsuits between 1998 and 2013. The current dispute centers around whether multiple insurance contracts issued by Defendants provide coverage for claims arising from litigation instituted against Plaintiffs.

### A.  The Underlying Insurance Policies

Health First and HFHP have purchased numerous insurance policies from Defendants. As relevant to this suit, Health First purchased from Executive Risk Indemnity, Inc. ("ERI") a Directors, Officers, and Trustees Liability Insurance Policy ("1997 Executive Risk D&O Policy," Doc. 41-2), effective 1997–1998,[2] and a Managed Care Organization Errors and Omissions Liability Policy ("1998 Executive Risk E&O Policy," Doc. 41-1), effective 1998–1999. Health

---

[1] All pinpoint citations refer to the electronic page number, as designated in this case.

[2] All policies mentioned herein became effective on October 1 of the year they were purchased and expired on October 1 of the following year, with the exception of the 2012 Managed Care Organizations Errors and Omissions Policy issued by Darwin Select Insurance Company and the 2012 Healthcare Organization Directors and Officers Liability Policy issued by Darwin National Assurance Company, which became effective on November 1 of the year they were purchased and expired on November 1 of the following year.

First subsequently purchased two Directors, Officers, and Trustees Liability Policies from ERI—one providing coverage from 2004–2005 ("2004 Executive Risk D&O Policy," Doc. 49-3) and another for 2006–2007 ("2006 Executive Risk D&O Policy," Doc. 49-4). In 2004, HFHP purchased a Managed Care Organization Errors and Omissions Liability Policy ("2004 Executive Risk E&O Policy," Doc. 49-2), effective 2004–2005, from Executive Risk Specialty Insurance Company.

In addition to the 2004 Executive Risk E&O Policy, HFHP purchased an Excess Insurance Policy ("2004 Capitol Excess E&O Policy," Doc. 50-1) from Defendant Capitol Specialty Insurance Corporation ("Capitol"), effective 2004–2005. HFHP also obtained from Capitol a Managed Care Organizations Errors and Omissions Liability Policy ("2006 Capitol E&O Policy," Doc. 50-2), effective 2006–2007. In 2012, HFHP purchased a Managed Care Organization Errors and Omissions Liability Policy ("2012 Darwin Select E&O Policy," Doc. 50-4) from Darwin Select Insurance Company ("Darwin Select"), effective 2012–2013. Additionally, Darwin National Assurance Company ("Darwin National") issued a Health Care Organization Directors and Officers Liability Insurance Policy ("2012 Darwin National D&O Policy," Doc. 50-3) to Health First, effective 2012–2013.

All of the abovementioned policies are "claims made policies," meaning that coverage is triggered under each policy for claims that are first made during the respective policy period. (Doc. 41-2 at 26; Doc. 41-1 at 15; Doc. 49-2 at 5; Doc. 49-3 at 45; Doc. 49-4 at 5; Doc. 50-1 at 2; Doc. 50-2 at 4; Doc. 50-3 at 61; Doc. 50-4 at 28). All of the policies also contain a related claims provision, which provides that all related claims are treated as a single claim and are deemed to have been made when the earliest of the related claims was made. (Doc. 41-1 at 22; Doc. 41-2 at 29–30; Doc. 49-2 at 14–15; Doc. 49-3 at 49; Doc. 49-4 at 9; Doc. 50-2 at 7–8; Doc. 50-3 at 72;

Doc. 50-4 at 32; *see* Doc. 50-1 at 4 (providing under the 2004 Capitol Excess E&O Policy that excess coverage would "apply in conformance with the terms and conditions of" the 2004 Executive Risk E&O Policy)). According to the policies, related claims include "all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events." [3] (Doc. 41-1 at 17; Doc. 49-2 at 8; *accord* Doc. 41-2 at 29–30; Doc. 49-3 at 17; Doc. 49-4 at 36; Doc. 50-2 at 14; Doc. 50-3 at 64; Doc. 50-4 at 39).

Also relevant is the prior/pending litigation exclusion. This exclusion, which is found in all of the policies, provides that coverage is barred for claims "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation . . . underlying or alleged in any prior and/or pending litigation as of the [policy's] Inception Date." (Doc. 41-2 at 28; Doc. 49-3 at 47; Doc. 49-4 at 7; *accord* Doc. 41-1 at 20; Doc. 49-2 at 12; Doc. 50-2 at 6; Doc. 50-3 at 67; Doc. 50-4 at 30; *see also* Doc. 50-1 at 4 (explaining that coverage under the 2004 Capitol Excess E&O Policy would apply in conformance with the terms and conditions of the primary policy)).

### B.    The Underlying Litigation

Between 1998 and 2013, Health First and other Health First entities were named as defendants in several lawsuits. In February 1998, Wuesthoff Health Systems, Inc. ("Wuesthoff") filed suit ("*Wuesthoff I*") against Health First, Holmes Regional Medical Center, Inc., and Cape Canaveral Hospital, Inc. in the U.S. District Court for the Middle District of Florida. (*See Wuesthoff I* Compl., Doc. 41-3). Wuesthoff alleged that Health First had engaged in

---

[3] Where policy language is quoted throughout this Order, all emphasis has been omitted.

anticompetitive behaviors to promote its own hospital to the detriment of Wuesthoff's Rockledge hospital, Wuesthoff Memorial Hospital, in central Brevard County *(Id. ¶¶ 2, 7)*. Wuesthoff voluntarily dismissed the case, (Apr. 7, 1999 Order, Doc. 49-5, at 4), and, in July 1999, refiled the case ("*Wuesthoff II*") in state court, adding HFHP as a defendant. (*Wuesthoff II* Compl., Doc. 49-6). The parties settled the case in 2000. (Doc. 49-17 ¶ 17; *see also* Settlement Agreement, Doc. 49-7; Mutual Release, Doc. 49-8). Wuesthoff again filed suit ("*Wuesthoff III*") against Health First in the Middle District of Florida in September 2005. (*Wuesthoff III* Compl., Doc. 41-5). The suit named the same defendants as *Wuesthoff II* and added Health First, Physicians, Inc. as a party. (*Compare* Doc. 49-6 at 2, *with* Doc. 41-5 at 2). Wuesthoff again alleged that Health First had engaged in anticompetitive conduct to thwart Wuesthoff's new hospital in Melbourne, part of southern Brevard County. (*See generally* Doc. 41-5). Thereafter, the court dismissed the action pursuant to Wuesthoff's motion for a voluntary dismissal, (March 8, 2007 Order, Doc. 49-13), and Wuesthoff refiled the case ("*Wuesthoff IV*") in state court in May 2007. (*Wuesthoff IV* Compl., Doc. 49-14).

Also in May 2007, Dr. Richard Hynes and the Brevard Orthopedic, Spine & Pain Clinic ("the B.A.C.K. Center") filed a lawsuit ("*Hynes*") in state court against the same Health First defendants as *Wuesthoff IV*. (*Hynes* Compl., Doc. 41-7). The *Hynes* action involved Health First's allegedly monopolistic and anticompetive behaviors, such as Health First's practice of punishing doctors that do not exclusively refer patients to Health First facilities and physicians. For example, the *Hynes* complaint alleged that Dr. Hynes and the B.A.C.K. Center were excluded from HFHP provider panels after they began to perform more surgical procedures at Wuesthoff Medical Center-Melbourne. (Doc. 41-7 ¶¶ 94–95). *Wuesthoff IV* and *Hynes* were consolidated for all pretrial purposes. (Sept. 8, 2010 Order, Doc. 41-10). The parties settled *Wuesthoff IV* in 2012,

(Doc. 49-17 ¶ 19); several of the causes of action in *Hynes* have been dismissed, but the case remains pending, (*see* Am. Notice of Voluntary Dismissal, Doc. 49-15; Notice of Voluntary Dismissal, Doc. 49-16).

Finally, in September 2013, Omni Healthcare Inc., Interventional Spine Institute of Florida, and several individual medical providers brought suit ("*Omni*") in the Middle District of Florida against Health First and other Health First entities. (*Omni* Compl., Doc. 45-2). The defendants in this action were the same as the defendants in the *Hynes* litigation, with the addition of Health First Insurance, Inc. and two former presidents of Health First and Homes Regional. (*See id.* at 2). The *Omni* complaint also focused on Health First's alleged abuse of its monopoly power and its wrongful anticompetitive conduct. Specifically, *Omni* involved allegations of retaliation experienced by the plaintiffs after they failed to comply with Health First's demands to, among other things, exclusively refer patients to Health First hospitals and physicians. (*Omni* Third Am. Compl., Doc. 45-3, ¶ 2). The *Omni* plaintiffs alleged that Health First's retaliatory actions included excluding the plaintiffs from the Health First network, (*see* Doc. 45-3 ¶¶ 222–23), having their Health First hospital privileges revoked, (*id.* ¶ 273), and preventing the plaintiffs from receiving referrals due to Health First's coercive and exclusive physician referral practices, (*id.* ¶ 269). The *Omni* suit is still pending. (Mathias Aff. in Resp. to Allied World's Mot. for Summ. J., Doc. 50-5, ¶ 23).

### C.    Acceptance and Denial of Coverage

It is undisputed that Plaintiffs submitted *Wuesthoff I* for coverage under the 1997 Executive Risk D&O Policy, and Executive Risk advanced defense expenses under a full reservation of rights. (Doc. 41 at 10; *see generally* Doc. 49). After *Wuesthoff II* was filed, Plaintiffs submitted *Wuesthoff II* for coverage under the same 1997 Executive Risk D&O Policy as well as the 1998

Executive Risk E&O Policy. (Doc. 41 at 10). Executive Risk paid defense and indemnity costs related to *Wuesthoff II* under both the 1997 and 1998 polices. (*Id.*). After *Wuesthoff III* was initiated, Plaintiffs submitted the claims for coverage. (*Id.*). Executive Risk informed Plaintiffs that, due to the substantial overlap in the factual allegations in *Wuesthoff I*, *Wuesthoff II*, and *Wuesthoff III*, *Wuesthoff III* would be considered a related claim to *Wuesthoff I* and *Wuesthoff II* and any coverage would be limited to the 1997 Executive Risk D&O Policy and the 1998 Executive Risk E&O Policy. Furthermore, Executive Risk contends that "[a]s a result of payments to Health First relating to all five *Wuesthoff/Hynes* lawsuits" under the 1997 and 1998 policies, "the combined limits of Executive Risk's 1997 D&O Policy and [the 1998 E&O] Policy, which totaled $16 million," (*see* Doc. 41-2 at 2 (setting a $15 million liability limit); Doc. 41-1 at 2 (setting a $1 million liability limit)), "have been fully exhausted." (Doc. 41 at 10).

Plaintiffs also sought coverage for the *Wuesthoff III*, *Wuesthoff IV*, *Hynes*, and *Omni* actions under the Allied World policies. Capitol received notice of the *Wuesthoff III*, *Wuesthoff IV*, and *Hynes* actions and denied coverage under the 2004 Capitol Excess E&O Policy. (Nov. 4, 2009 Letter, Doc. 45-4, at 2; Aug. 1, 2013 Letter, Doc. 45-5, at 2–3). Capitol denied coverage because *Wuesthoff III*, *Wuesthoff IV*, and *Hynes* were deemed related to *Wuesthoff I* and *Wuesthoff II*, which were covered under the 1997 Executive Risk D&O Policy and the 1998 Executive Risk E&O Policy. (*See* Doc. 45-4 at 2; Doc. 45-5 at 2–3). Thus, the claims were deemed to have been made prior to the inception date of the 2004 Capitol Excess E&O Policy. (*See* Doc. 45-4 at 2; Doc. 45-5 at 3).

Additionally, Darwin National and Darwin Select informed Plaintiffs that there was no coverage for the *Omni* action under the 2012 Darwin National D&O Policy, the 2012 Darwin Select E&O Policy, or any other policy issued by Capitol, Darwin Select, or Darwin National.

(Oct. 18, 2013 Letter, Doc. 45-6, at 2–3). The letter denying coverage indicated that the *Wuesthoff*, *Hynes*, and *Omni* suits were all related, and thus the claims for which Plaintiffs sought coverage were deemed made before any policy was issued by Capitol, Darwin Select, or Darwin National. (*Id.* at 1–2, 10–11).

 As a result, Plaintiffs instituted this suit. Plaintiffs seek coverage for defense costs incurred as well as the amount paid to settle the claims first asserted in *Wuesthoff III* under the 2004 Executive Risk D&O Policy, the 2004 Executive Risk E&O Policy, and the 2004 Capitol Excess E&O Policy. Plaintiffs also seek coverage for defense costs incurred to defend the *Hynes* action under the 2006 Executive Risk D&O Policy and the 2006 Capitol E&O Policy. Additionally, Plaintiffs seek coverage for defense costs incurred in the *Omni* action under the 2012 Darwin Select E&O Policy and the 2012 Darwin National D&O Policy.

## II.    MOTION TO STRIKE

The Court will address Plaintiffs' Motion to Strike because it affects the evidence that the Court will consider when analyzing Defendants' Motion for Summary Judgment. Plaintiffs ask this Court to strike Exhibit A to Executive Risk's Reply regarding its Motion for Summary Judgment. Exhibit A is a letter from legal counsel that represented Health First in the underlying litigation. (May 21, 2009 Letter, Doc. 51-1). Plaintiffs argue that the letter should be stricken because it is new evidence that was inappropriately submitted with Executive Risk's Reply, thereby denying Plaintiffs the opportunity to respond. The Court disagrees. The letter is not submitted by Executive Risk to support an entirely new argument. Rather, it was provided by Executive Risk to rebut the position taken by Plaintiffs in their Response that the *Hynes* and *Westhoff* suits were not related. Therefore, submitting the letter with their Reply was permissible. *See First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 788 (11th Cir. 2008);

*Stewart-Patterson v. Celebrity Cruises, Inc.*, No. 12-20902-CIV, 2012 WL 5997057, at *2 (S.D. Fla. Nov. 30, 2012) (recognizing that denying a motion to strike evidence filed with a summary judgment reply brief is proper where the evidence submitted on reply "merely respond[s] to arguments and issues raised in [the] plaintiff's opposition without proffering new grounds for entry of summary judgment" (quotation omitted)); *see also Giglio Sub s.n.c. v. Carnival Corp.*, No. 12-21680-CIV, 2012 WL 4477504, at *3 (S.D. Fla. Sept. 26, 2012), *aff'd*, 523 F. App'x 651 (11th Cir. 2013) (per curiam) (denying a motion to strike evidence submitted with a reply brief and noting that although the defendants could have addressed the issue by submitting the evidence with their motion for summary judgment, the defendants had no "obligation to raise the issue preemptively").

Moreover, it appears that one member of Plaintiffs' counsel in this case was also involved in the underlying litigation and was carbon copied on the letter. "Since [Plaintiffs'] counsel participated in the underlying case, [Plaintiffs' counsel] cannot claim surprise or lack of knowledge." *First Specialty Ins. Corp.*, 300 F. App'x at 788. While Plaintiffs aver that they have been deprived of an opportunity to respond to the letter, they did not request leave to file a surreply to address the contents of the letter. *See Lightsey v. Potter*, 268 F. App'x 849, 852 (11th Cir. 2008) (affirming the district court's reliance on declarations attached to a reply brief and noting that the party moving to strike the declarations as new evidence submitted with a reply never sought leave to file a surreply); *see also United States v. Carter*, 506 F. App'x 853, 860 (11th Cir. 2013) ("[H]ad Carter wished to respond to the government's reply, she could have sought . . . leave to do so, but, as she did not, the [judge] was free to rely on the evidence the government attached to its reply."); M.D. Fla. R. 3.01(c) (permitting a party to file additional memoranda with leave of court).

Plaintiffs also take the position that the letter should be stricken from the record to avoid disclosure, not to Executive Risk—a request that would be futile for obvious reasons—but to third parties. (*See* Doc. 54 at 2 n.2 ("Health First's motion here is concerned with protecting communications relative to third-parties.")).[4] Plaintiffs' contend that the letter was intended to be a confidential communication between insured and insurer. However, upon examining the letter, the Court finds that it does not appear to contain any confidential information. The letter, written in 2009, merely recites the claims asserted in the litigation and the procedural histories of *Wuesthoff IV* and *Hynes*. While the letter is also labeled "Attorney Work Product," the burden of demonstrating that the attorney work product privilege applies, "rests on the party advocating for the protection." *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 620 (S.D. Fla. 2013). Plaintiffs have failed to demonstrate that the privilege applies. Nor is it clear how the privilege would apply to bar disclosure of the letter to unnamed third parties. *See Visual Scene, Inc. v. Pilkington Bros., plc.*, 508 So. 2d 437, 442 (Fla. 3d DCA 1987) (noting that the attorney work product privilege is "designed to promote the adversary system by protecting an attorney's trial preparations, not necessarily from the rest of the world, but from an opposing party in litigation"). In light of the previous considerations, and noting that "[a] motion to strike is a drastic remedy that is disfavored by the courts," *Agan v. Katzman & Korr, P.A.*, 328 F. Supp. 2d 1363, 1367 (S.D. Fla. 2004), the Court will deny Plaintiffs' Motion to Strike.

As to Plaintiffs' alternative argument that the letter should be filed under seal, Plaintiffs' request will be denied without prejudice due to Plaintiffs' failure to comply with Local Rule 1.09.

---

[4] The Court notes the distinction because Executive Risk's Response focuses on the common interest doctrine and why the letter is not privileged as to Executive Risk. But Plaintiffs are not arguing that the letter should be kept from Executive Risk and do not appear to dispute that the common interest doctrine applies. (*See* Doc. 54 at 2 (citing cases where the common interest doctrine applied)).

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

### IV.    SUMMARY JUDGMENT

#### A.    Principles of Insurance Contract Interpretation

It is undisputed that Florida law governs the interpretation of the insurance policy at issue. In Florida, "[s]ummary judgment is appropriate in declaratory judgment actions seeking a

declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001); *see also Gas Kwick, Inc. v. United Pac. Ins. Co.*, 58 F.3d 1536, 1538–39 (11th Cir. 1995) ("Under Florida law, interpretation of an insurance contract is a matter of law to be decided by the court."). "[T]he Florida Supreme Court has made clear that the language of the policy is the most important factor." *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) (quotation omitted). Additionally, "insurance contracts are construed according to their plain meaning." *Id.* at 1274 (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)). "[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Taurus Holdings, Inc.*, 913 So. 2d at 532 (quotation omitted).

Where the "relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." *Westport Ins. Corp. v. VN Hotel Grp., LLC*, No. 6:10-cv-222-Orl-28KRS, 2011 WL 4804896, at *2 (M.D. Fla. Oct. 11, 2011) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)), *aff'd*, 513 F. App'x 927 (11th Cir. 2013). In order for an insurance contract to be found ambiguous, "[t]here must be a genuine inconsistency, uncertainty, or ambiguity in meaning that remains after resort to the ordinary rules of construction." *Valiant Ins. Co. v. Evonosky*, 864 F. Supp. 1189, 1191 (11th Cir. 1994) (quotation omitted). "[A] court may *not* rewrite the policy or add meaning to create an ambiguity." *Id.* Additionally, the mere fact that policy language requires interpretation does not render the language ambiguous. *Id.* "Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter

who prepared the policy." *Westport Ins. Corp.*, 2011 WL 4804896, at *2 (quoting *Auto-Owners Ins. Co.*, 756 So. 2d at 34). Moreover, "[e]xclusionary clauses are construed even more strictly against the insurer than coverage clauses," and the insurer has the burden of demonstrating that an exclusion in a policy applies. *Id.* (quotation omitted).

      **B.**      **Interpreting the Insurance Policies at Issue**

As noted, all of the insurance policies either have, or incorporate by reference, a related claims provision. The issue of coverage here turns on the application of these related claims provisions. While the language of some of the related claims provisions differ slightly, they all operate in the same manner: they all treat related claims as though they were a single claim made on the date of the earliest claim. The specific language of the provisions are as follows.

The 1997 Executive Risk D&O Policy, 2004 Executive Risk D&O Policy, and 2006 Executive Risk D&O Policy each provide: "All Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events shall be deemed to be a single Claim made at the time the earliest such Claim is made." (Doc. 41-2 at 29–30; Doc. 49-3 at 49; Doc. 49-4 at 9). The policies continue by stating that "[a] Claim shall be deemed made when the Underwriter is notified [pursuant to the notification conditions of the policy] or when such Claim is first made or asserted against an Insured, whichever occurs first." (Doc. 41-2 at 30; Doc. 49-3 at 49; Doc 49-4 at 9).

The 1998 Executive Risk E&O Policy, 2004 Executive Risk E&O Policy, 2006 Capitol E&O Policy, 2012 Darwin Select E&O Policy, and 2012 Darwin National D&O Policy define related claims as "all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances,

situations, transactions, or events or the same or related series of facts, circumstances, situations,

transactions, or events whether related logically, causally, or in any other way," (Doc. 41-1 at 17;

Doc. 49-2 at 8; *accord* Doc. 50-2 at 14; 50-3 at 64; Doc. 50-4 at 39). Based on that definition, the

policies further state:

> All Related Claims, whenever made, shall be deemed to be a single Claim and shall
> be deemed to have been first made on the earliest of . . . (1) the date on which the
> earliest Claim within such Related Claims was received by an Insured; or (2) the
> date on which written notice was first given to the Underwriter of a Wrongful Act
> which subsequently gave rise to any of the Related Claims, regardless of the
> number and identity of claimants, the number and identity of Insureds involved, or
> the number and timing of the Related Claims, even if the Related Claims
> comprising such single Claim were made in more than one Policy Period.

(Doc. 49-2 at 14–15; Doc. 50-2 at 7–8; Doc. 50-4 at 32; *accord* Doc. 41-1 at 22; *see also* Doc. 50-

3 at 72 (stating in the 2012 Darwin National D&O Policy that "[a]ll Related Claims will be treated

as a single Claim made when the earliest of such Related Claims was first made, or when the

earliest of such Related Claims is treated as having been made in accordance with [the notification

conditions of the policy], whichever is earlier").

Finally, the 2004 Capitol Excess E&O Policy provides coverage "in conformance with the

terms and conditions of, and endorsements to [the 2004 Executive Risk E&O Policy]." (Doc. 50-

1 at 4). The 2004 Capitol Excess E&O Policy continues by stating that "[i]n no event will the

coverage under this Policy be broader than the coverage under any Underlying Insurance" and that

"[c]overage under this Policy will attach only after all Underlying Insurance has been exhausted

by the actual payment of loss by the Underlying Insurers." (*Id.*).

Defendants argue that the claims for which Plaintiffs seek coverage are related to the claims

asserted in *Wuestoff I* and *Wuesthoff II* and are therefore deemed to be a single claim made under

the 1997 Executive Risk D&O Policy and the 1998 Executive Risk E&O Policy. Accordingly,

coverage would be available for Plaintiffs' claims, if at all, under the 1997 and 1998 policies issued

by Executive Risk. Defendants further argue that because coverage has been exhausted under both the 1997 Executive Risk D&O Policy & 1998 Executive Risk E&O Policy, there is no coverage for Plaintiffs' claims.

As an initial matter, courts have frequently upheld Defendants' interpretation of the related claims provision—i.e., that a claim may relate back to a claim made at an earlier time, whether the previous claim was made under a prior policy or at a time when no policy was in effect—and enforced related claims provisions accordingly. *See, e.g.*, *Direct Gen. Ins. Co. v. Houston Cas. Co.*, 139 F. Supp. 3d 1306, 1314 (S.D. Fla. 2015) (analyzing a claims-made insurance policy with a similar related claims clause and explaining that "when a claim is made within the Policy period, a Related Claim made after the Policy period would still be deemed covered under the Policy because both Claims are deemed one Claim made on the earlier, within-Policy-period date"), *aff'd sub nom. Direct Gen. Ins. Co. v. Indian Harbor Ins. Co.*, 661 F. App'x 980 (11th Cir. 2016) (per curiam); *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1260, 1263 (11th Cir. 2000) (per curiam) (holding that a provision dealing with related wrongful acts, which is similar to the related claims provisions at issue here, was unambiguous and that multiple claims were related pursuant to the policy); *Rsui Indem. Co. v. Atty's Title Ins. Fund, Inc.*, No. 2:13-cv-670-FtM-38CM, 2016 WL 7042960, at *4 (M.D. Fla. June 6, 2016) (holding that the plain language of a policy with a nearly identical related claims clause was "clear and unambiguous"); *Fed. Ins. Co. v. Surujon*, No. 07-22819-CIV, 2008 WL 2949438, at *5 (S.D. Fla. July 29, 2008) (holding that claims were related under a policy's related claims provision where the provision had nearly identical language as the related claims provisions here); *Gidney v. Axis Surplus Ins. Co.*, 140 So. 3d 609, 613–16 (Fla. 3d DCA 2014) (holding that, pursuant to a provision similar to the related claims provision here, a

claim related back to a previous claim and discussing relevant cases that had interpreted related claims provisions).

Here, however, Plaintiffs argue that the prior/pending litigation clause in each policy limits the claims that can be related under the related claims provision and renders the policies ambiguous. Specifically, Plaintiffs argue that due to the interplay between the prior/pending litigation clause and the related claims provision, only claims made during and after a given policy's inception date, and not before, may be deemed related.

At first glance, this argument does not appear to advance Plaintiffs' case because the claims at issue here were filed after the inception dates of the 1997 and 1998 policies. Nevertheless, Plaintiffs arbitrarily ignore the 1997 and 1998 policies, focusing instead on the inception dates of the subsequent policies. Plaintiffs cite the prior/pending litigation exclusion in an attempt to justify the use of the later dates and disregard for the 1997 and 1998 policies. Plaintiffs highlight that pursuant to the exclusion, claims that have a connection to claims that were litigated prior to that particular policy's inception are excluded from coverage under that particular policy. According to Plaintiffs, because these claims are completely excluded from coverage, it follows that these claims cannot be deemed related to the claims that were previously litigated. Plaintiffs essentially argue that because, absent endorsement, all claims bearing a connection to *Wuesthoff I* and *Wuesthoff II* are excluded from coverage under subsequently issued policies via the prior/pending litigation clause, such claims cannot be related to *Wuesthoff I* and *Wuesthoff II* under the related claims provision. This argument is a confusing leap in logic and devoid of support.

Plaintiffs' argument is not supported by the language of the policies. The plain language of the prior/pending litigation exclusions has no impact on the related claims provisions. *See Rsui Indem. Co.*, 2016 WL 7042960, at *5 (noting that a prior and pending litigation exclusion and a

related claim provision have two distinct purposes, and therefore, "a claim . . . could escape the Prior and Pending Litigation Exclusion yet fall within the Related Claims Condition"). Further, Plaintiffs' interpretation would nullify the plain language of the related claims provision, which is not permitted under Florida law. *See Westport Ins. Corp.*, 2011 WL 4804896, at *2 ("[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." (quoting *Auto-Owners Ins. Co.*, 756 So. 2d at 34)).

The 1997 Executive Risk D&O Policy, 2004 Executive Risk D&O Policy, and 2006 Executive Risk D&O Policy state that "*[a]ll Claims*" that are related "shall be deemed to be a single Claim made at the time the earliest such Claim is made." (Doc. 41-2 at 29–30; Doc. 49-3 at 49; Doc. 49-4 at 9 (emphasis added); *see also* Doc. 50-3 at 72 (providing that "*[a]ll related claims* will be treated as a single claim" (emphasis added))). Similarly, the 1998 Executive Risk E&O Policy, 2004 Executive Risk E&O Policy—and thus the 2004 Capitol Excess E&O Policy—2006 Capitol E&O Policy, 2012 Darwin Select E&O Policy, and the 2012 Darwin National D&O Policy state that "*[a]ll* related claims, *whenever made*, shall be deemed to be a single Claim." (Doc. 49-2 at 14; Doc. 50-2 at 7; Doc. 50-4 at 32; *accord* Doc. 41-1 at 22). To read Plaintiffs' proposed temporal restriction into the related claims provision, which is clearly absent from the policy language, is impermissible under Florida law. *See Taurus Holdings, Inc.*, 913 So. 2d at 532 ("[C]ourts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." (quotation omitted)). Based on the language of the relevant policies, there is no reason why a claim made at a later date could not be related to a claim made in 1997 or 1998. Indeed, so long as the claim qualifies as a related claim under the policy, the contract explicitly directs that the subsequent claim be deemed made when the earliest of the related claims was made. In this case, assuming the claims are related, the earliest of the related

claims were made under the 1997 and 1998 Executive Risk policies and before any Allied World policy was issued.

Plaintiffs make similar arguments regarding a few prior/pending litigation clauses where the dates referenced by those clauses are different than the inception date of the insurance policy. Several of the prior/pending litigation clauses were amended to exclude litigation that had been initiated as of a specified date, rather than the inception date of the policy. Plaintiffs also point to the prior/pending litigation clause in a renewal policy where the relevant date for purposes of the exclusion was the inception date of the policy that was renewed. These dates, however, have no impact on the related claims provision. First, as discussed, whether a claim is excluded under the prior/pending litigation provision is irrelevant to the determination of whether claims are related. *See Rsui Indem. Co.*, 2016 WL 7042960, at *4 (rejecting nearly identical arguments as those made by Plaintiffs here with regards to the endorsed prior/pending litigation exclusions and their impact on the related claims provisions); *see also Indian Harbor Ins. Co.*, 661 F. App'x at 985 (adopting a position consistent with the views expressed in *Rsui* and rejecting the insurer's argument that the related claims provision was ambiguous because it was inconsistent with the endorsed pending and prior litigation exclusion). Moreover, "exclusionary clauses cannot be relied upon to create coverage." *Rsui Indem. Co.*, 2016 WL 7042960, at *5 (quoting *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007)). Thus, it follows that "adding a strict temporal limitation to an exclusion's applicability," as the endorsements do here, "does not, and cannot, create coverage." *Id.* Furthermore, the policy language, including the related claims provision and the prior/pending litigation exclusions, as endorsed, are clear and unambiguous. *See id.* at *4.

Plaintiffs' argument with respect to the amended prior/pending litigation exclusions and Plaintiffs' disregard for the related claims provision is especially problematic given that every

endorsed prior/pending litigation clause states that "[a]ll other terms, conditions and limitations of this Policy shall remain unchanged." (Doc. 49-3 at 38; Doc. 49-2 at 32; 49-4 at 18; Doc. 50-2 at 27; Doc. 50-3 at 9). This demonstrates that the related claims provision in each policy is unaffected by the respective endorsement and still applies. *See Rsui Indem. Co.*, 2016 WL 7042960, at *5 (noting that despite amending the prior and pending litigation exclusion via endorsement, the endorsement stated that "[a]ll other terms and conditions of this policy remain unchanged," and thus, the related claims clause was still "a condition that must be satisfied for coverage").

Plaintiffs further maintain that certain policies provide coverage for the claims at issue here because they provide coverage for antitrust claims. Plaintiffs rely on Endorsement 25, the Specific Entity Antitrust Claim Endorsement, of the 2006 Executive Risk D&O Policy ("Endorsement 25") and Endorsement 4 of the 2012 Darwin National D&O Policy ("Endorsement 4"). Endorsement 25 provides coverage for "Claims for Antitrust Activities . . . based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving Wuesthoff Health Systems, Inc." (Doc. 49-4 at 59). Endorsement 4 states that "in connection with Claims arising out of Antitrust Activity . . . [t]he obligation of the Insurer to pay Loss in connection with Antitrust Claims will only be in excess of $500,000 (hereinafter 'Antitrust Retention')." (Doc. 50-3 at 10).

The Court also finds this argument unavailing. Endorsement 25 and Endorsement 4 also state that "[a]ll other terms, conditions and limitations of this Policy shall remain unchanged." (Doc. 49-4 at 60; Doc. 50-3 at 10). Thus, the related claims provision still applies and potentially eliminates the insurers' obligation to provide coverage under either of the policies. Furthermore, like the prior/pending litigation exclusions, Endorsement 25 and Endorsement 4, when considered beside the related claims provision, do not give rise to any inconsistency or conflict so as to deem the policies ambiguous. Endorsement 25 begins by stating that coverage is available "[t]o the

extent that Loss resulting from a . . . Antitrust Claim [involving Wuesthoff Health Systems, Inc.] is covered under Insuring Agreement (B) or (C)." (Doc. 49-4 at 59). Pursuant to the related claims provision, Insuring Agreements (B) and (C) of the 2006 Executive Risk D&O Policy do not provide coverage for antitrust claims involving Wuesthoff if such claims are related to claims previously submitted for coverage under a prior policy. Endorsement 4 is completely inapposite to the related claims provision. Additionally, it does not demonstrate that the 2012 Darwin National D&O Policy provides absolute coverage for all antitrust claims as Plaintiffs seem to suggest. Rather, it appears that Endorsement 4, entitled "Antitrust Retention," was designed to amend the retention rate for antitrust claims. (*Compare* Doc. 50-3 at 2, *with id.* at 10).

### C.  Relatedness

Having rejected Plaintiffs' interpretation of the insurance policies and determining that the claims at issue here can relate back to claims made under the 1997 Executive Risk D&O Policy and the 1998 Executive Risk E&O Policy, the Court must now determine whether *Wuesthoff III*, *Wuesthoff IV*, *Hynes*, and *Omni* are in fact related to *Wuesthoff I* or *Wuesthoff II*.

Defendants argue that the claims are related due to the substantial similarity and common factual predicates asserted in the underlying complaints. Plaintiffs attempt to defeat Defendants' relatedness argument by arguing that the Court cannot properly determine whether the claims are related solely by looking to the underlying complaints. Plaintiffs contend that the related claims provision requires that the claims involve the "same or related facts, circumstances, situations, transactions, or events," not the same or related allegations. Thus, Plaintiffs contend that Defendants have not sufficiently shown that the claims are in fact related. In the alternative, Plaintiffs argue that the claims are not sufficiently related as each complaint is based on distinct factual allegations and circumstances.

As to Plaintiffs' argument that it would be improper for the Court to rely upon the underlying complaints in determining whether the claims are related, the Court disagrees. Courts do not require a showing of the actual facts to determine whether multiple claims are related. Rather, courts often focus on and compare the underlying allegations to determine if multiple claims are related under an insurance policy's related claims provision. *See Vozzcom, Inc. v. Great Am. Ins. Co. of N.Y.*, 374 F. App'x 906, 908 (11th Cir. 2010) (noting that all three complaints allege similar facts and violations and therefore all three suits were to be considered a single claim under the policy's related claims provision); *Wendt*, 205 F.3d at 1263–64 (comparing the allegations in two complaints against the insured and finding that the conduct at issue in both cases was related so that the policy's related claims provision applied); *Gidney*, 140 So. 3d at 615 (highlighting the allegations underlying the two claims and concluding that the claims were related pursuant to the policy's related claims provision); *see also Capital Growth Fin. LLC v. Quanta Specialty Lines Ins. Co.*, No. 07-080908-CIV, 2008 WL 2949492, at *5 (S.D. Fla. 2008) (applying New York law and examining the allegations asserted in multiple arbitration claims to conclude that the wrongful acts were related and thus considered a single claim pursuant to the policy's related claim clause). Furthermore, Plaintiffs' argument that it would be improper to solely look to the allegations in the complaints because Plaintiffs are seeking indemnity, rather than a declaration that Defendants owe a duty to defend, which, unlike the duty to indemnify, is determined by relying solely upon the allegations of the underlying complaints, misses the mark. The narrow issue before the Court that Plaintiffs raise is not what materials the Court can look to in determining whether Defendants have an obligation to provide defense costs, but rather, what materials or information the Court can rely upon in determining whether the claims are related.

For the reasons stated above, looking to the underlying complaints to determine whether the various claims are related is proper.

At the outset the Court notes that it need only find that the claims alleged in each complaint—*Wuesthoff III*, *Wuesthoff IV*, *Hynes*, and *Omni* are related to either the claims alleged in *Wuesthoff I* or the claims alleged in *Wuesthoff II* for the claim to be deemed a related claim and that, therefore, coverage is provided under the 1997 Executive Risk D&O Policy or the 1998 Executive Risk E&O Policy. Courts have found related claims provisions with nearly identical language as the related claims provisions at issue here to be "very broad" and to require "only that the claims indirectly arise out of related circumstances." *Houston Cas. Co.*, 139 F. Supp. 3d at 1315 (quotation omitted). In determining whether claims are related under an insurance policy, the Eleventh Circuit has adopted the position that the claims need only have a logical or causal connection. *Wendt*, 205 F.3d at 1263; *see also Quanta Specialty Lines Ins. Co.*, 2008 WL 2949492, at *4 (explaining that the relatedness inquiry "focuses simply on whether the claims are logically linked by a 'sufficient factual nexus'"). Indeed, for claims to be related there need not be "exact factual overlap, or even identical legal causes of action." *Quanta Specialty Lines Ins. Co.*, 2008 WL 2949492, at *4. Factors that courts look to in determining whether claims are related include "whether the parties are the same, whether the claims all arise from the same transactions, whether the 'wrongful acts' are contemporaneous, and whether there is a common scheme or plan underlying the acts." *Id.*

A review of the underlying complaints reveals that the claims asserted in *Wuesthoff III* and *IV* as well as *Hynes* and *Omni* are related to both *Wuesthoff I* and *II*. The *Wuesthoff* suits involved the same parties, the same geographic markets—South and Central Brevard County—and the same alleged wrongful conduct. Indeed, whether brought under federal or state law, many of the causes

of action brought in the *Wuesthoff* suits are identical, including claims for monopolization, attempt to monopolize, illegal tying, conspiracy to restrain trade, and monopolization as to the Medicare managed care market.[5] (*Compare* Doc. 41-3 at 9–15, *and* Wuesthoff II Third Am. Compl., Doc. 41-4, at 21–29, *with* Doc. 41-5 at 23–30, *and* Wuesthoff IV First Am. Compl., Doc. 41-6, at 10–48).[6] *See Quanta Specialty Lines Ins. Co.*, 2009 WL 2949492, at *2 (finding that claims asserted in several arbitrations were related pursuant to the insurance policy and that all of the arbitrations "allege[d] nearly identical causes of action"). *Hynes* and *Omni* also brought similar causes of action as *Wuesthoff I* and *II*. (*See* Doc. 41-7 at 18–71; Doc. 45-3 at 65–97). Although *Hynes* and *Omni* involved different plaintiffs than the *Wuesthoff* suits, the actions involved the same defendants as the *Wuesthoff* suits, with the addition of Health First Physicians, Inc. and two prior presidents of Health First entities. Moreover, that different claimants brought suit is not dispositive in a related claims analysis. *See Houston Cas. Co.*, 139 F. Supp. 3d at 1309–10, 1316, 1319 (finding that thousands of individual complaints from various individuals as well as a law office and two class actions filed by classes of Florida health care providers and MRI providers were all related claims pursuant to the policy's related claims provision); *Quanta Specialty Lines Ins. Co.*, 2008 WL 2949492, at *2, 5 (holding that claims asserted by different investors in numerous arbitrations proceedings were related).

---

[5] The claims here represent counts that are alleged in *Wuesthoff III* and *IV* and either (although sometimes both) *Wuesthoff I* and *II*.

[6] The Court does not find Executive Risk's reliance on the third amended complaint filed in *Wuesthoff II* improper. Moreover, in previous litigation, Health First acknowledged that all three complaints filed in *Wuesthoff II* alleged the same violations as *Wuesthoff I*. (Health First's Mot. for Summ. J. in *Wuesthoff II*, Doc. 41-11, at 7). Similarly, because the original complaint and the third amended complaint in the *Omni* action are substantially similar, the Court refers to the third amended complaint.

The complaints in the *Wuesthoff*, *Hynes*, and *Omni* actions all request damages and injunctive relief as a result of Health First's anticompetitive and monopolistic behaviors. Additionally, all actions assert the same general allegations—that Health First is a monopolist that used its market dominance to foreclose competition and unreasonably restrain trade through exclusionary devices and practices—resulting in loss of business to the plaintiffs; diminished to non-existent competition in the health care industry in the South and Central Brevard County; and harm to consumers due to the resulting lack of health care alternatives, poor quality of health care, and increased prices.

More importantly, the complaints assert identical allegations throughout. And where the allegations are not identical, many are substantially similar. *Wuesthoff I, III, IV, Hynes*, and *Omni* alleged that Health First coerced physicians to refer their patients to Health First-operated facilities by offering benefits to those who kept patients within the Health First system and by threatening those who failed to comply. (Doc. 41-3 ¶¶ 8, 25, 27; Doc. 41-5 ¶¶ 7, 47, 56, 68–71, 102–03; Doc. 41-6 ¶¶ 12–14, 26, 48, 53, 57, 113, 152; Doc. 41-7 ¶¶ 4, 33, 85, 131, 192, 209, 242, 249–50, 291; Doc. 45-3 ¶¶ 2, 7, 134, 136, 138, 159, 265, 293; *see* Doc. 41-5 ¶ 33; Doc. 41-6 ¶¶ 56, 58, 62, 115; Doc. 41-7 ¶¶ 88, 90, 92–95, 212, 230, 247–48, 251; *see also* Doc. 45-3 ¶¶ 206, 208, 212–13, 269). Plaintiffs argue that the *Omni* complaint focuses on Health First's 2013 acquisition of Melbourne Internal Medicine Associates ("MIMA"), which was not mentioned in *Wuesthoff I* or *II*. However, many of the allegations surrounding MIMA involve the same or related facts as *Wuesthoff I*, including that Health First utilized coercive methods, such as providing benefits to MIMA physicians and physician practice groups if they admitted a majority of patients to Health first hospitals. (*Compare* Doc. 41-3 ¶ 8, *with* Doc. 45-3 ¶¶ 125, 265). In addition to physician coercion, the *Wuesthoff I*, *Hynes*, and *Omni* complaints all alleged that Health First threatened to bring in

new physicians to compete with those that refused to cooperate with its exclusive referral demands. (Doc. 41-3 ¶ 8; Doc. 41-7 ¶¶ 89, 246; Doc. 45-3 ¶ 205).

The complaints in *Wuesthoff II*, *III*, *IV*, *Hynes*, and *Omni* all alleged that Health First "bundled" their services. According to the plaintiffs, Holmes Regional, a "must have" hospital in South Brevard County, would not negotiate hospital contracts with managed care plans unless Cape Canaveral and Palm Bay were also included in the network. (Doc. 41-4 ¶¶ 28–29, 38, 39, 43, 72; Doc. 41-5 ¶¶ 31, 43, 52, 96–98; Doc. 41-6 ¶¶ 11, 49–50, 104, 107–08; Doc. 45-3 ¶ 119; *see* Doc. 41-4 ¶ 41; Doc. 41-6 ¶¶ 70–71, 97; Doc. 41-7 ¶¶ 59, 70, 81, 238). Additionally, all of the *Wuesthoff II, III,* and *IV*, *Hynes*, and *Omni* plaintiffs asserted that Health First engaged in unlawful price fixing as to managed care plans and, with the exception of *Wuesthoff I*, that Health First provided preferable pricing to HFHP. (Doc. 41-4 ¶¶ 34, 38, 43, 67; Doc. 41-5 ¶¶ 31, 34, 43, 49, 54–55; Doc. 41-6 ¶¶ 12, 45; Doc. 41-7 ¶ 74; Doc. 45-3 ¶ 119).

The plaintiffs in *Wuesthoff II*, *IV*, and *Omni* all alleged that HFHP refused to enter managed care contracts with them. (Doc. 41-4 ¶¶ 25, 38, 43; Doc. 41-6 ¶ 48; Doc. 45-3 ¶ 279). Additionally, the plaintiffs in *Wusthoff III*, *IV*, and *Hynes* alleged that individuals enrolled in HFHP were steered to Health First Hospitals. (Doc. 41-5 ¶ 36; Doc. 41-6 ¶ 47; Doc. 41-7 ¶ 77). While this was not alleged in *Wuesthoff I* or *II*, it is a claim which clearly could have resulted—either directly or indirectly—from Health First's preferential pricing practices and exclusive contracting efforts, which were asserted in *Wuesthoff I* and *II*.

Another common allegation appears in *Wuesthoff II*, *III*, *IV*, and *Hynes*. In those cases, it was alleged that when Wuesthoff decided to build a new hospital in South Brevard County, Health First used the Florida Certificate of Need process to delay and increase the costs for Wuesthoff.

(Doc. 41-4 ¶ 36; Doc. 41-5 ¶ 57; Doc. 41-6 ¶¶ 101, 153; Doc. 41-7 ¶¶ 51, 83, 118, 236, 274; *see* Doc. 41-7 ¶¶ 193, 292).

Thus, a review of the complaints, which contained very similar, if not identical, allegations in support of the plaintiffs' broader claims that Health First was engaging in unlawful anticompetitive and monopolistic behaviors, leads to the conclusion that the claims in *Wuesthoff I* and *II* and the claims in *Wuesthoff III*, *IV*, *Hynes*, and *Omni* were "based on, ar[ose] out of, directly or indirectly result[ed] from, in consequence of, or in any way involve[ed] the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." (Doc. 49-3 at 49; Doc. 49-4 at 9; Doc. 50-3 at 64; *accord* Doc. 49-2 at 8; Doc. 50-2 at 14; Doc. 50-4 at 39). Moreover, given the significant similarities between the complaints, the allegations in the various lawsuits undoubtedly demonstrate a common scheme and, therefore, are related. Each complaint avers that Plaintiffs have intentionally indulged in wrongful antitrust and monopolizing conduct with the overarching goal of furthering their own success, dominating the South and Central Brevard County healthcare markets, eliminating competition, and establishing a monopoly in the healthcare service industry— from physician and hospital services to the Medicare managed care market—ultimately resulting in higher prices, fewer health care alternatives, and injury to consumers. *See Wendt*, 205 F.3d at 1264 (finding that two lawsuits were related under a related claims provision and explaining that although the alleged conduct in the two different lawsuits "involved different types of acts, these acts were tied together because all were aimed at a single particular goal").

The minor distinctions asserted by Plaintiffs are insufficient to persuade this Court that the claims are not related as a matter of law. Moreover, despite Plaintiffs' argument that *Wuesthoff III* was based on grievances that could not have possibly been raised in the prior *Wuesthoff* litigation,

as demonstrated above, many of the same grievances were in fact raised in *Wuesthoff I*, *II*, and *III*, even if such grievances involved slightly different contextual backgrounds given the ongoing developments in the health care industry in Brevard County between 1998 and 2007. The related claims provision deems claims related when the claims "*in any way involv[e]* the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." (Doc. 41-2 at 29–30; Doc. 49-3 at 49; Doc. 49-4 at 9; *see* Doc. 41-1 at 17; Doc. 49-2 at 8; Doc. 50-2 at 14; Doc. 50-3 at 64; Doc. 50-4 at 39 (emphasis added)). That standard is certainly met here.

For purposes of determining whether *Wuesthoff III* is related to *Wuesthoff I* and *II*, the Court finds the position taken by Plaintiffs[7] in the *Wuesthoff III* litigation particularly enlightening. In that case, Plaintiffs filed two summary judgment motions, arguing that *Wuesthoff I*, *II*, and *III* all raised the same "essential claims." (*Wuesthoff III* Mot. for Summ. J., Doc. 41-11, at 7). Plaintiffs posited in *Wuesthoff III* that the complaint merely "realleg[ed] claims based on the same factual predicate that Wuesthoff alleged in the prior state and federal actions," referring to *Wuesthoff I* and *II*. (*Id.* at 9; *Wuesthoff III* Second Mot. for Summ. J., Doc. 41-9, at 9; *see also* Doc. 41-11 at 6–10; Doc. 41-9 at 6–10). Plaintiffs even contended that several of the counts alleged in *Wuesthoff III* "relate[d] directly to facts, transactions, and circumstances . . . that were or could have been alleged in Wuesthoff's prior lawsuits." (Doc. 41-9 at 10). Thus, that *Wuesthoff III* is related to *Wuesthoff I* and *II* is supported not only by the Court's review of the underlying complaints and independent analysis, but also by the position previously taken by Plaintiffs in litigation. *See Houston Cas. Co.*, 139 F. Supp. 3d at 1315–16 (finding claims related under an insurance policy

---

[7] This excludes Health First Health Insurance, Inc. as they were not a party to *Wuesthoff I*, *II*, or *III*.

and noting that this finding was "consistent with [the p]laintiff's own characterization," where the plaintiff had previously asserted that the claims were related).

Because the claims for which Plaintiffs' seek coverage are related to *Wuesthoff I* and *II*, the claims are deemed to be made under the 1997 Executive Risk D&O Policy and the 1998 Executive Risk E&O Policy. Furthermore, because coverage has been exhausted under those policies, it follows that there is no coverage for Plaintiffs' claims arising out of *Wuesthoff III*, *IV*, *Hynes*, and *Omni*.[8]

To prevent the Court from finding that the claims are related, Plaintiffs also argue that Defendants' interpretation of the related claims provision is so broad that to find in favor of Defendants would render coverage under the policies illusory. Plaintiffs further contend that the Court should refuse to adopt such a broad interpretation of the related claims provision, "even if supported by policy language" in order to avoid an absurd result—namely, a finding that there is no coverage for Plaintiffs' claims. (Doc. 49 at 23).

Under Florida law, "when limitations or exclusions completely contradict the insuring provisions, insurance coverage becomes illusory." *Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 966 (11th Cir. 2014) (quoting *Purrelli v. State Farm Fire & Cas. Co.*, 698 So. 2d 618, 620 (Fla. 2d DCA 1997)). That is not the case here. As previously discussed, courts have consistently held that related claims provisions with similar language are broad yet unambiguous and that such provisions should be enforced according to their terms. *See, e.g.*, *Indian Harbor Ins. Co.*, 661 F. App'x at 981, 985; *Rsui Indem. Co.*, 2016 WL 7042960, at *3–5; *see also Surujon*,

---

[8] Having determined that there is no coverage for the claims at issue pursuant to the policies' related claims provisions, this Court declines to address Allied World's alternative argument that there is no coverage for the *Omni* suit pursuant to Exclusion III(C)(3)(2) of the 2012 Darwin National D&O Policy and Plaintiffs' response.

2008 WL 2949438, at *5 (finding that claims were related under a broad related claims provision). The related claims provision does not completely contradict the insuring provisions but establishes a condition that must be satisfied—that is, a claim may not be related to another claim made under a previous policy or prior to the inception of a policy—in order for the subsequently issued policy to provide coverage. *Rsui Indem. Co.*, 2016 WL 7042960, at *5 (explaining that the related claims provision "is not an exclusion; it is a condition that must be satisfied for coverage"). The Court's interpretation of the related claims provision does not nullify coverage for all antitrust or monopolization claims, as Plaintiffs contend. It merely serves to group all antitrust or monopolization claims that are related together so that coverage is provided under a single policy—the policy in place when the earliest of the related claims was made. And despite Plaintiffs' suggestion otherwise, this Court has not found that the claims at issue are related simply because they involve "monopolistic" activity in the "health services" market in "Brevard County." (Doc. 49 at 22). Rather, as explained at length above, the claims are related because they all involve similar, and at times, identical allegations, which are not bare assertions but are alleged with a level of specificity.

Because the Court has found no ambiguity or conflict in the policy language, this Court denies Plaintiffs' request that the Court overlook the policy language to avoid a purportedly absurd result. It is a fundamental and well-established principle in Florida insurance law that in circumstances such as this, where the language is unambiguous and the provisions are not in conflict, the plain language of the policy governs. *See Taurus Holdings, Inc.*, 913 So. 2d at 532. For this same reason the Court rejects Plaintiffs' argument that summary judgment is improper at this time. Plaintiffs contend that additional discovery is necessary to allow them to collect extrinsic evidence that will evince the parties' intentions as to the meaning of the policies at issue. But it is

only appropriate to examine such extrinsic evidence if there is an ambiguous contract term. *See Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 734 F. Supp. 2d 1304, 1315 (S.D. Fla. 2010) ("If the relevant policy language is clear and unambiguous, the court must infer the parties' intent from its plain language, not from extrinsic evidence. . . . Similarly, the 'reasonable expectations' of the insured are not properly considered in the interpretation of clear and unambiguous policy language." (citations omitted)), *aff'd*, 453 F. App'x 871 (11th Cir. 2011); *see also Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995) ("Questions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent, such as precontract negotiations, to interpret the disputed term."). Accordingly, the Defendants' summary judgment motions are not premature. For the reasons stated above, Defendant Executive Risk's Motion for Summary Judgment and Defendant Allied World's Motion for Summary Judgment will be granted.

## V.   CONCLUSION

Therefore, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiffs' Motion to Strike (Doc. 54) is **DENIED**.

2. Defendant Executive Risk's Motion for Summary Judgment (Doc. 41) is **GRANTED**.

3. Defendant Allied Word's Motion for Summary Judgment (Doc. 45) is **GRANTED**.

4. All other pending motions are **DENIED as moot**.

5. The status conference set for February 16, 2016, is **CANCELLED**.

6. The Clerk is directed to enter a judgment in favor of Defendants and against Plaintiffs. Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida on February 14, 2017.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record